UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

STEVEN J. ERICKSON,

Petitioner,

v.

DAVID R. CRIST, Warden,

Respondent.

Civil No. 01-699 (JRT/SRN)

**REPORT AND RECOMMENDATION**

Steven J. Erickson, Minnesota Correctional Facility - Stillwater, 970 Pickett Street North, Bayport, Minnesota, 55003-1489, Petitioner, pro se.

Robert A. Stanich, Assistant Attorney General, 525 Park Street, Suite 500, St. Paul, Minnesota, 55103, for Respondent.

SUSAN RICHARD NELSON, United States Magistrate Judge

This matter is before the undersigned Magistrate Judge of the District Court on the petition of Steven J. Erickson for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent has filed a return, (Docket Nos. 7-9), contending that the petition should be dismissed. The matter has been referred to the undersigned for report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1(c). For the reasons discussed below, the Court concludes that Petitioner's habeas corpus petition should be DISMISSED WITH PREJUDICE.

## I. BACKGROUND

In May 1998, a Mower County jury found Petitioner guilty of first degree murder, conspiracy to commit first degree murder, and theft of three handguns. He was sentenced to life in prison for the murder conviction, and he received a concurrent sentence of one

MAY 0 2 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

year and one day for the theft conviction. He is presently serving his sentence at the Minnesota Correctional Facility at Stillwater, Minnesota.

The murder victim in Petitioner's case was a marijuana dealer named Michael Hjelman. According to Hjelman's girlfriend, he believed that Petitioner had stolen some marijuana from him. A day or two before the murder, Petitioner learned that Hjelman had been making threats against him, and had placed "a hit" on him because of the alleged marijuana theft.

At about this time, Petitioner attended a party at the home of a young woman whose parents were out of town. While at the party, Petitioner and a friend named Iverson broke into a gun safe and stole three handguns. They later took the guns to Iverson's home, where they showed them to another friend named Watkins.

Watkins took Petitioner and Iverson to Hjelman's home, but they did not stop because it appeared no one was there. Petitioner and Iverson returned to the house from which they had stolen the handguns, where the party was still continuing. After a while, however, they decided to go back to Hjelman's home again. By then, it was approximately 2:00 a.m. They parked their car some distance from Hjelman's home and approached from there on foot -- each carrying one of the stolen handguns. They knocked on the front door, and when Hjelman answered, Iverson and Petitioner pushed their way in and began shooting. Hjelman was shot a total of ten times, and quickly bled to death. His girlfriend, who heard the shooting from her bedroom, escaped from the house and contacted the police.

After the shooting, Petitioner and Iverson returned to the party. Petitioner called his girlfriend and told her that he had shot Hjelman. Sometime later, Petitioner went to his

girlfriend's house and described the murder to her. Iverson also told his girlfriend about the murder.

It did not take the police long to gather evidence relating to Hjelman's murder, and Iverson was soon under arrest. He quickly confessed to his own involvement in the crime, and he later told the police about Petitioner's involvement as well. Iverson ultimately entered into a plea bargain, which required him to testify for the prosecution at Petitioner's murder trial.

Petitioner does not deny that he shot Hjelman. He testified at his own trial and admitted that he was aware of an alleged "hit" that Hjelman had placed on him. He told the jury that although he vaguely remembered leaving the party with Iverson on the night of the murder, he had been too drunk to remember anything else that may have occurred that night -- including the shooting of Hjelman.

Petitioner's defense was that he should not be found guilty of first degree murder, because he was intoxicated. He claimed that the prosecution had failed to prove he acted with pre-meditation, but the jury rejected that argument and convicted him on the first degree murder charge.

Around the time when the jury returned its verdict, the trial court judge learned that the bailiff had spoken to at least one of the jurors during deliberations. Two days after the verdict was delivered, the trial court judge conducted a hearing to determine what the bailiff had said to the jury. Petitioner's counsel attended that hearing, but Petitioner was not personally present. The bailiff and the jury foreman testified at the post-verdict hearing. They both confirmed that the foreman had asked to see a large diagram of the victim's home. The bailiff thought it would be appropriate to provide the large diagram, because

the jury already had a smaller (8½" x 11") version of the diagram. When the judge informed the bailiff that the larger diagram should not have been furnished, the bailiff retrieved it from the jury room. The foreman was the only juror who was present at that time, and the bailiff told him that he had to take back the larger diagram because it had not been received as evidence. The foreman said that the jury had not looked at the diagram. Before leaving the jury room, the bailiff voluntarily suggested that if the jurors had questions about the victim's home, they might want to look at a certain videotape that apparently had been received as evidence. After hearing from the bailiff and the jury foreman, the trial judge concluded that Petitioner had not been prejudiced by the bailiff's contact with the jury.

Following his conviction and sentence, Petitioner filed a direct appeal in the Minnesota Supreme Court.[1] He claimed that the trial judge committed two specific errors with regard to the hearing on the bailiff's contact with the jury: First, the judge failed to interview all of the jurors at a formal "Schwartz hearing,"[2] to determine whether the bailiff had caused any prejudice with respect to any individual juror; and second the judge failed to ensure that Petitioner was personally present at the hearing.

Petitioner also argued on direct appeal that the trial judge should not have required him to wear leg restraints during his trial, without first ensuring that such restraints were

---

[1] Under Minnesota law, appeals in first degree murder cases are taken directly to the State Supreme Court, rather than the Minnesota Court of Appeals. Minn.Stat. § 632.14.

[2] A Schwartz hearing is a post-trial proceeding during which jurors can be questioned about events that arguably could have tainted their verdict. See Schwartz v. Minneapolis Suburban Bus Co., 258 Minn. 325, 104 N.W.2d 301 (1960).

truly necessary. He asked the Minnesota Supreme Court to remand his case to the trial court for a Schwartz hearing on how the leg restraints affected the jury.[3]

The State Supreme Court found that the trial court had erred by (1) ordering Petitioner to wear leg restraints, without first providing a sufficient explanation for that order, (2) failing to conduct a full Schwartz hearing on the bailiff's contact with the jury, and (3) excluding Petitioner from the limited hearing that was conducted on the bailiff's contact with the jury.[4] The case was remanded to the trial court, and the trial judge which was instructed to conduct a Schwartz hearing on those three matters. State v. Erickson, 597 N.W.2d 897 (Minn. 1999) ["Erickson I"].

The trial judge did conduct a Schwartz hearing as instructed, and all twelve jurors appeared and were questioned individually. Petitioner was personally present during those proceedings. At the conclusion of the Schwartz hearing, the trial judge filed another memorandum and order. The judge reported that "[t]he jurors were unanimous that the bailiff's contact with them had no effect on their deliberations," and that "[t]he bailiff's error in this matter was harmless and did not prejudice Defendant 'beyond a reasonable doubt.'"[5]

The trial judge further concluded that (a) the use of leg restraints on Petitioner during his

---

[3] A copy of Petitioner's brief on appeal is included in Respondent's Return, [Docket No. 9], at Appendix 6.

[4] The Supreme Court also identified other errors that are not at issue in the present habeas corpus proceeding.

[5] The trial court's memorandum and order following the Schwartz hearing is at Appendix 3 of the Return. (Docket No. 9.) The quoted portions of the memorandum are at pp. 15 and 18 of that Appendix.

trial was justified because of several events that occurred before the trial began,[6] and (b) the use of the leg restraints had no effect on the outcome of the trial.

After the Schwartz hearing was completed, Petitioner's case returned to the Minnesota Supreme Court for further review. State v. Erickson, 610 N.W.2d 335 (Minn. 2000) ["Erickson II"]. The Supreme Court first considered whether Petitioner suffered any prejudice as a result of the trial court's handling of the leg restraint issue. Id. at 337. "If the jurors were unaware of the restraint," the Court said, then "the trial court's error in ordering the restraint [without explaining the justification for such restraint] is not presumptively prejudicial." Id. After examining the evidence developed at the Schwartz hearing, the Supreme Court concluded that the jurors were not aware of the leg restraints that Petitioner was wearing in the courtroom, and "[b]ecause the jurors were unaware of [Petitioner's] restraint, there is no presumption of prejudice." Id. at 338. Having determined that the restraints were not prejudicial because they were unseen, the Supreme Court decided that it was "unnecessary to perform harmless error analysis." Id.

The Court next considered "the extent of any prejudice to [Petitioner] caused by the bailiff's improper contact with the jury." Id. After reviewing the Schwartz hearing evidence on that issue, the Supreme Court concluded that "the verdict was not tainted by prejudice caused by the bailiff's improper conduct." Id. at 339. The Court also rejected several other claims that are not relevant to this issues presented here, and ultimately affirmed

[6] The trial judge reported that Petitioner "in no uncertain terms: (1) told a witness' mother to 'GET the F*** out of the courtroom!,' (2) threatened the county attorney, (3) was involved in confrontations with a jailer, and (4) was involved in confrontations with the prime State's witness, who was also involved in the murder." (Respondent's Return, [Docket No. 9], Appendix 3, p. 19.)

Petitioner's first degree murder conviction.

Petitioner then filed his current habeas corpus petition, in which he lists two grounds for relief:

(1) that his constitutional rights were violated because the Minnesota Supreme Court did not specifically decide whether the use of leg restraints during his trial was harmless error; and

(2) that his constitutional rights were violated because he was not personally present at the initial hearing regarding the bailiff's contact with the jury.

For the reasons discussed below, the Court finds that both of these claims must be denied on the merits.

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") sets forth the standards that govern this Court's review of habeas corpus petitions filed by state prisoners. The relevant portion of the AEDPA, 28 U.S.C. § 2254(d), provides that:

> "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

In Williams v. Taylor, 529 U.S. 362 (2000), the United States Supreme Court discussed the meaning of this statute, and how it should be applied by the federal district

courts. The Supreme Court recognized that

> "a state-court decision can be 'contrary to' this Court's clearly established precedent in two ways. First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours."

Id. at 405 (emphasis added).

> "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."

Id. at 413.

The Court also explained that

> "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.... [¶] [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

Id. at 409, 411 (emphasis added).

A writ of habeas corpus may also be available where the state courts' resolution of a prisoner's criminal case is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In other words, habeas relief can be granted if the conviction is based on findings of fact that could not reasonably be derived from the evidentiary record. When reviewing a state court decision, however, "a federal court... presumes that the state court's factual determinations are correct," and that presumption "may be rebutted only by clear and convincing

evidence." Lee v. Gammon, 222 F.3d 441, 442 (8th Cir. 2000).

Needless to say, a federal district court is not allowed to conduct its own de novo review of a prisoner's constitutional claims. Habeas relief cannot be granted unless the prisoner has identified, and substantiated, a specific error committed by the state courts. Moreover, he must show that the state courts committed the type of error that is actionable under § 2254(d), as that statute has been interpreted by the Supreme Court in Williams.

## III. DISCUSSION

### A. The Leg Restraints

The Minnesota Supreme Court reviewed the evidence developed during the Schwartz hearing in Petitioner's case, and found that no juror was actually aware that Petitioner was wearing leg restraints during his trial. The Court therefore concluded that Petitioner had not been prejudiced as result of the leg restraints, and that his conviction need not be overturned because of those restraints. Petitioner now contends that with regard to the leg restraints issue the Minnesota Supreme Court made "an unreasonable determination of the facts in light of the evidence," and reached a legal conclusion that "was contrary to, or involved an unreasonable application of, clearly established Federal law." The Court disagrees.

#### (1) Determination Of The Facts

In Erickson II, the Supreme Court carefully explained how it determined that "the jurors were unaware of [Petitioner's] restraint inside the courtroom." 610 N.W.2d at 338. The Court first pointed out that nine of the twelve jurors specifically testified at the Schwartz hearing that they had not seen Petitioner wearing any restraining device during the trial.

Id. One of the three remaining jurors thought that Petitioner might be wearing some type of restraint, but she "made no personal observation" of any such restraint. Id. Although another juror said he had seen Petitioner wearing a chain or device on his ankle, the trial court pointed out, and the Supreme Court agreed, that this juror must have been unaware of the leg restraint that Petitioner was actually wearing, because the restraint was not, in fact, a chain or device around the ankle that would have been visible to the juror. Id.[7] The twelfth juror thought that Petitioner might have been wearing a restraint of some kind in a hallway, because he was "walking differently as his legs were not bending normally." Id. Although this juror "noticed that [Petitioner] seemed to pull his pant leg down in the courtroom, she never observed the restraint." Id.

Thus, the Minnesota Supreme Court offered a credible explanation for its determination that the jurors were not actually aware of the leg restraints that Petitioner was wearing in the courtroom during his trial. That determination is entitled to a presumption of correctness that can be rebutted only by clear and convincing evidence. Petitioner has offered no such evidence here. Therefore, on the leg restraint issue, this Court cannot find that the state courts made an unreasonable determination of the facts. See Kinder v. Bowersox, 272 F.3d 532, 546 (8th Cir. 2001) (denying habeas relief where petitioner "failed to provide clear and convincing evidence – or any evidence for that matter – to rebut the presumption of reasonableness that attached to the state court's determination that no jurors were aware of the [petitioner's] shackles").

---

[7] Evidently, the restraint attached directly to Petitioner's leg and was hidden under his pants. Thus, the one juror who claimed that he saw a device or chain around Petitioner's ankle must have been confused or mistaken, and must not have been aware of the real restraint that Petitioner was wearing.

**(2) Legal Conclusion**

After determining that the jurors were unaware that Petitioner was wearing leg restraints in the courtroom, the Minnesota Supreme Court summarily concluded that Petitioner had not suffered any actual prejudice warranting relief on appeal. Petitioner contends that this conclusion is directly contrary to, or is at least an unreasonable application of, U.S. Supreme Court case law. However, the cases Petitioner has cited -- Holbrook v. Flynn, 475 U.S. 560 (1986) and Estelle v. Williams, 425 U.S. 501 (1976) -- do not support his contention that the use of physical restraints is automatically prejudicial, and that harmless error review is therefore mandatory, even if the jury does not know about the restraints.

In Estelle v. Williams, the Court addressed the possible prejudice that can occur when a criminal defendant appears before a jury wearing "prison garb." The Court expressed concern that "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment." 425 U.S. at 504-05. However, the Court rejected the notion that prison garb will always prejudice the Defendant to the point of vitiating his right to a fair trial. The Court pointed out that a person who is tried for a crime that he committed while he was in prison would suffer little prejudice from wearing prison garb, because the jurors presumably would expect him (as a prisoner) to be wearing such clothing. Id. at 507 ("[n]o prejudice can result from seeing that which is already known"), quoting United States ex rel. Stahl v. Henderson, 472 F.2d 556, 557 (5th Cir.), cert. denied, 411 U.S. 971 (1973). The Court also cited several cases which (according to the Court) suggest that "it is not an uncommon defense tactic to produce the defendant in jail clothes in the hope of eliciting sympathy from the jury." Id. at 508. This further

demonstrates that the Court did not adopt an "automatic prejudice" rule in Williams.

Furthermore, the distinctive and readily identifiable prison garb at issue in Williams is clearly distinguishable from the invisible leg restraints at issue here. Nothing in Williams suggests that criminal defendants are automatically prejudiced by security precautions that are unnoticed by the jury.

In Holbrook, a habeas petitioner argued that he had been denied due process because uniformed police officers were present in the courtroom during his trial. The Court expressly rejected that argument, holding that "'reason, principle and common human experience'... counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial." 475 U.S. at 569, quoting Williams, 425 U.S. at 504. There certainly is nothing in Holbrook to suggest that a criminal defendant is necessarily prejudiced by the use of restraints, even when the restraints are not visible to the jury.

In short, Erickson II is not inconsistent with any U.S. Supreme Court decision. Williams, Holbrook and other relevant Supreme Court decisions generally protect criminal defendants from visible influences in the courtroom that might imply guilt or danger. These cases do not support Petitioner's contention that he was automatically prejudiced by the leg restraints that he wore during his trial, regardless of whether the jury saw them. See Schettino v. Kelly, No. 89 CV 2795 (E.D.N.Y. 1990) 1990 WL 137392 at *3 ("[i]f the jury does not see any restraint, no prejudice accrues to a defendant"). In this case, once the State Supreme Court determined that the jury had not actually observed Petitioner wearing restraints in the courtroom, it was not constitutionally necessary to perform a harmless

error analysis.[8] Petitioner's first ground for relief is therefore rejected.

**B. The Bailiff Misconduct Hearing Claim**

Petitioner's second ground for relief – that he was wrongly excluded from the initial hearing regarding the bailiff's contact with the jury – does not merit much discussion. In Erickson I, the Minnesota Supreme Court concluded that the trial judge had committed two errors with respect to that initial hearing – (1) the judge failed to examine all of the jurors at a full Schwartz hearing, and (2) the judge failed to give Petitioner the opportunity to be personally present at the hearing. The Supreme Court concluded that the original hearing was deficient and directed the trial court to hold a new one.

Thus, the case came back to the trial court for a full Schwartz hearing in order to cure the errors identified by the Supreme Court. All of the jurors were present and available for questioning at that hearing. Petitioner was represented by counsel, and he personally appeared at the hearing. Petitioner had a full and unfettered opportunity to explore whether any prejudice occurred as a result of the bailiff's unauthorized contact with the jury, and he had a full and unfettered opportunity to present his arguments about any potential prejudice. Again, Petitioner was personally present, and he was therefore able to personally see and hear the jurors' testimony. The Schwartz hearing completely superceded the initial hearing on the bailiff misconduct issue, and it effectively cured both of the errors that occurred at that initial hearing.

---

[8] In any event, Petitioner's conviction would surely withstand a harmless error analysis. The evidence of his guilt – including his two confessions and the incriminating testimony of his accomplice – was overwhelming.

One of the most elemental principles of federal habeas corpus jurisprudence is that state courts must be given the first opportunity to cure constitutional errors cited by state prisoners. O'Sullivan v. Boerckel, 526 U.S. 838, 844 (1999) ("[c]omity... dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief"). The Minnesota Supreme Court is the federal district court's co-equal partner in safeguarding the federal constitutional rights of state criminal defendants. The State Supreme Court properly fulfilled that role in this case, by recognizing that Petitioner was constitutionally entitled to be present at the bailiff misconduct hearing. See Kentucky v. Stincer, 482 U.S. 730, 745 (1987) ("a defendant is guaranteed the right to be present at any stage of the criminal proceeding... if his presence would contribute to the fairness of the procedure"). Furthermore, the Minnesota Supreme Court provided specific and appropriate relief for the constitutional error that it found, by invalidating the defective bailiff misconduct hearing, and directing the trial court to conduct a new one. Thus, the Supreme Court effectively ensured that Petitioner's due process right to be personally present at all critical stages of his criminal prosecution was fully honored and protected.

Petitioner has failed to explain how or why the Minnesota Supreme Court should have acted differently on his claim pertaining to the bailiff misconduct hearing. More specifically, he has not shown that the State Supreme Court's resolution of that claim was contrary to, or involved an unreasonable application of, any United States Supreme Court decision; nor has he shown that the State Supreme Court's resolution of that claim was based on any unreasonable determination of the facts. Therefore, Petitioner's second

ground for relief must also be rejected on the merits.

## IV. RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

Petitioner's application for habeas corpus relief under 28 U.S.C. § 2254, (Docket No. 1), be DISMISSED WITH PREJUDICE.

Dated: May 2, 2002

Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this report and recommendation by filing with the Clerk of Court and serving all parties, within ten days after being served with a copy thereof, written objections which specifically identify the portions of the proposed findings, recommendations or report to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief with ten days after service thereof. All briefs filed under this rule shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.